## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| Michael Bowen, Michael Campbell, Jeffrey Clark, Clifford Cyr, Mike DesChenes, Ernest Dore III, Jeffrey Gagne, David Googins, Thomas Herrin, Patrick Huff, Paul Masse, Travis Pinette, Paul Roy, James Snow, Stephen Temm, and Richard Veilleux<br><br>Plaintiffs,<br><br>-v-<br><br>FLOWERS FOODS, INC., LEPAGE BAKERIES PARK STREET LLC, and CK SALES CO., LLC<br><br>Defendants | Case No.<br><br>**COMPLAINT**<br>**AND**<br>**JURY DEMAND** |

Plaintiffs, by and through undersigned counsel, file this Complaint and aver as follows:

1.      This is a Complaint brought to obtain declaratory, injunctive and monetary relief resulting from Defendants misclassification of their Maine bakery distributor drivers ("Distributors") as "independent contractors." Defendants Flowers Foods, Inc., Lepage Bakeries Park Street LLC ("LePage"), and CK Sales Co., LLC ("CK Sales") and their subsidiaries and affiliates (collectively "Flowers" or "Defendants") are in the wholesale bakery business and rely on Distributors to deliver to and stock bakery goods in grocery stores, mass retailers, and fast food chains. Plaintiffs Bowen, Campbell, Clark, Cyr, DesChenes, Dore, Gagne, Googins, Herrin, Huff, Masse, Pinette, Roy, Snow, Temm, and Veilleux are each current or former Distributors with Flowers in Maine. Plaintiffs allege violations of the Federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and seek Declaratory Judgment pursuant to 28 U.S.C. § 2201.

2.      This action challenges both the classification of Plaintiffs as independent contractors and Defendants' denial to Plaintiffs of the rights, obligations, privileges and benefits, including overtime compensation, owed to them as employees under federal law.

3.      All Plaintiffs were previously part of an Opt-In Collective Action against Flowers Foods in the case of *Noll v. Flowers Foods, et al.*, No. 1:15-cv-00493 (D. Me.).  On August 3, 2020, the Court in *Noll* decertified the Collective Action.  However, the Plaintiffs remain a part of a certified Rule 23 Class in the *Noll* case, and thus final judgment on the FLSA claims has not been entered.  However, because the decertification of the FLSA Collective Action impacts the statute of limitations on the Plaintiffs' FLSA claims, Plaintiffs bring this new action to protect their statute of limitations.  The *Noll* Court's certification of the Rule 23 state-law class claims, but decertification of the FLSA collective action acts as a de jure exception to the rule against claim splitting, and thus Plaintiffs' claims in this matter are proper.

## **PARTIES**

4.      Plaintiff Michael Bowen is a resident of Bangor, Maine. Plaintiff Bowen worked as a Distributor for Flowers in Maine from 2013 until September 2019.  He performed delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Bowen operated out of a distribution center in Holden, Maine run by LePage.  Plaintiff Bowen regularly worked 60 to 65 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Bowen used his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

5.      Plaintiff Michael Campbell is a resident of Waterville, ME. Plaintiff Campbell has worked as a Distributor for Flowers in Main from 2013 until the present day. He performed

delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Campbell operates out of a distribution center in Waterville, Maine run by LePage.  Plaintiff Campbell regularly works 55 to 60 hours per week and does not receive overtime premium pay at any time during the statutory period. Plaintiff Campbell uses his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

6.      Plaintiff Jeffrey Clark is a resident of South Daytona, Florida. Plaintiff Clark worked as a Distributor for Flowers in Maine from September 2013 until March 2014. He performed delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Clark operated out of a distribution center in Holden, Maine run by LePage. Plaintiff Clark regularly worked 55 to 60 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Clark used his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

7.      Plaintiff Clifford Cyr is a resident of Madawaska, Maine. Plaintiff Cyr worked as a Distributor for Flowers in Maine from September 2013 until March 2015. He performed delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Cyr operated out of a distribution center in Presque Isle, Maine run by LePage. Plaintiff Cyr regularly worked 75 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Cyr used his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

8.      Plaintiff Mike DesChenes is a resident of Leeds, Maine. Plaintiff DesChenes worked as a Distributor for Flowers in Maine since September 2013 until April 2019. He performed delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff DesChenes operated out of a distribution center in Lewiston, Maine run by LePage. Plaintiff DesChenes regularly worked 60 to 65 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff DesChenes used his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

9.      Plaintiff Ernest Dore III is a resident of Biddeford, Maine.  Plaintiff Dore has worked as a Distributor for Flowers in Maine since September 2013. He performs delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Dore operates out of a distribution center in Biddeford, Maine run by LePage. Plaintiff Dore regularly worked 40 to 55 hours per week and has not receive overtime premium pay at any time during the statutory period.  Plaintiff Dore has used his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

10.      Plaintiff Jeffrey Gagne is a resident of Auburn, Maine. Plaintiff Gagne worked as a Distributor for Flowers in Maine since September 2013 until July 2018. He performed delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Gagne operated out of a distribution center in Waterville, Maine run by LePage. Plaintiff Gagne regularly worked 60 to 65 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Gagne used his small personal vehicle to perform services for Defendants every other week on Sundays.

11.     Plaintiff David Googins is a resident of Windham, Maine. Plaintiff Googins worked as a Distributor for Flowers in Maine from September 2013 to November 2015. He performed delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Googins operated out of a distribution center in Portland, Maine run by LePage. Plaintiff Googins regularly worked 55 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Googins used his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

12.     Plaintiff Thomas Herrin is a resident of North Waterboro, Maine. Plaintiff worked as a Distributor for Flowers in Maine from September 2013 to April 2014. He performed delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Herrin operated out of a distribution center in Biddeford, Maine run by LePage/CK Sales. Plaintiff regularly worked 50 to 55 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Herrin used his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

13.     Plaintiff Patrick Huff is a resident of Biddeford, Maine. Plaintiff Huff worked as a Distributor for Flowers in Maine from May 2015 to April 2017.  He performed delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Huff operated out of a distribution center in Biddeford, Maine run by LePage. Plaintiff Huff regularly worked 60 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Huff used his small personal vehicle to perform

services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

14.     Plaintiff Paul Masse is a resident of Auburn, Maine. Plaintiff has worked as a Distributor for Flowers in Maine since September 2013. He performs delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Masse operates out of a distribution center in Lewiston, Maine run by LePage/CK Sales. Plaintiff regularly worked 55 to 60 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Masse used his small personal vehicle to perform services every week during the applicable statutory period on Wednesdays, Thursdays, Fridays, and Saturdays.

15.     Plaintiff Travis Pinette is a resident of Mapleton, Maine. Plaintiff worked as a Distributor for Flowers in Maine from September 2013 to April 2014. He performed delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Pinette operated out of a distribution center in Presque Isle, Maine run by LePage/CK Sales. Plaintiff regularly worked 80 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Pinette used his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

16.     Plaintiff Paul Roy is a resident of Biddeford, Maine.  Plaintiff worked as a Distributor for Flowers in Maine from September 2013 to April 2014. He performed delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Roy operated out of a distribution center in Biddeford, Maine run by LePage/CK Sales. Plaintiff regularly worked 50 hours per week and did not receive overtime

premium pay at any time during the statutory period. Plaintiff Roy used his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

17.     Plaintiff James Snow is a resident of Bangor, Maine. Plaintiff has worked as a Distributor for Flowers in Maine since September 2013. He performs delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Snow operates out of a distribution center in Holden, Maine run by LePage/CK Sales. Plaintiff regularly worked 50 to 55 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Snow used his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

18.     Plaintiff Stephen Temm is a resident of Saco, Maine. Plaintiff Temm worked as a Distributor for Flowers in Maine from September 2013.   He performed delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Temm operated out of a distribution center in Portland, Maine run by LePage. Plaintiff Temm regularly worked 45 to 50 hours per week and did not receive overtime premium pay at any time during the statutory period. Plaintiff Temm used his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

19.     Plaintiff Richard Veilleux is a resident of Waterville, Maine. Plaintiff Veilleux has worked as a Distributor for Flowers in Maine since September 2013. He performs delivery and merchandizing services to local retailers of bakery and snack food products manufactured or sold by Flowers. Plaintiff Veilleux operates out of a distribution center in Waterville, Maine run by

LePage.  Until 2016, Plaintiff Veilleux regularly worked 70 hours per week.  Since he sold his second route in 2016, Plaintiff Veilleux now works 45 hours per week.  He has not received overtime premium pay at any time during the statutory period. Plaintiff Veilleux has used his small personal vehicle to perform services for Defendants every week during the applicable statutory period on Wednesdays and Sundays.

20.    Flowers Foods, Inc. is a Georgia corporation with its principal place of business at 1919 Flowers Circle, Thomasville, Georgia, 31757.  Flowers Foods hires individuals, whom it classifies as independent contractors, to distribute its products by delivering them to grocery stores and stocking the products on store shelves.  Flowers Foods, Inc. employs distributors in at least 31 states throughout the southern and eastern parts of the United States, including Maine.  Flowers Foods is and at all relevant times was the employer of Plaintiffs under Maine law.

21.    LePage is a Maine Limited Liability Company with its principal place of business at Country Kitchen Plaza, PO Box 1900, Auburn, ME 04211-1900.  Lepage operates three bakeries, two in Lewiston, Maine, and one in Brattleboro, Vermont.  Lepage is a wholly owned subsidiary of Flowers Foods.  Lepage uses Distributors, whom it classifies as independent contractors, to deliver and stock Flowers Foods bakery and snack products from its Maine distribution centers to retailers throughout Maine.  Lepage is and at all relevant times was an employer under Maine law.

22.    CK Sales is a Delaware Limited Liability Company with its principal place of business at 11 Adamian Drive, Auburn, Maine 04210.  From its inception until 2013, the company used route sales employees to distribute Lepage products.  In 2013, in connection with the purchase of Lepage Bakeries by Flowers Foods, it converted its employees, including Plaintiffs, to

independent contractors under what it called a franchise distributorship. CK Sales is the entity that contracts with Distributors for purposes of distributing Lepage and Flowers products.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331, federal question jurisdiction.

24.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and 1391(c) because a substantial part of the events giving rise to the claim occurred in this district.

## FACTUAL BASIS

**A. Flowers Acquired Lepage and Converted its Employees to Independent Contractors**

25.     Defendant Flowers Foods, Inc. is a Georgia corporation whose business consists of developing and marketing bakery products for national sale and distribution through an integrated network of subsidiaries, such as Lepage Bakeries.

26.     The subsidiaries bake the products and carry out Flowers' distribution at the local level.

27.     Distributors are an integral part of Defendants' business, and distribute more than 85 percent of Defendants' total products.

28.     Defendants define a Distributors' core responsibilities as ordering products, stocking shelves, maintaining special displays, and developing and maintaining good customer relations to ensure adequate inventory and removing unsold goods

29.     Prior to its acquisition by Flowers Foods in 2012, Lepage was an independent bakery that delivered bread to customers using Route Sales Associates ("RSA").

30.     RSAs were classified as employees of Lepage, received benefits, paid vacation, disability insurance, and workers comp, and were paid $200 per week plus commissions calculated from weekly sales.

31.     When Flowers Foods purchased Lepage, it converted its RSA employees to independent contractors in accordance with Flowers' Distributor Model.

32.     Flowers provided Lepage a detailed plan for the conversion, including specific instructions as to how territories should be determined, drawn, and described.

33.     The RSAs were notified in mid-2013 that to keep their jobs they were required to purchase their routes from the bakery and become independent contractors.

34.     The decision to convert the RSAs from employees to independent contractors was made on a universal basis based on the Flowers' model; none of the Defendants made individual determinations with respect to whether any RSA should remain an employee or become an independent contractor.

**B. The Flowers Model Centralizes Control Over the Marketing and Sale of Products.**

35.     Defendants' customers are primarily large retail and grocery chains such as Wal-Mart, Harris Teeter, Target, and Dollar General.  Flowers' top ten customers account for nearly half of all sales.  Flowers' largest customer—Walmart/Sam's Club—represents 20 percent of the Company's sales.

36.     Flowers established a National Accounts Team responsible for developing and maintaining relationships with national account retailers.

37.     The National Accounts Team is "the face of the company," representing Flowers with each retailer or restaurant because the customer cannot logistically work individually with each Flowers bakery.

38.     Flowers' National Accounts Team initiates meetings with potential and existing customers, leads proposal meetings, bring samples of the products to customers, and offers suggested retail and wholesale pricing.

39.     The National Accounts Team handles all business discussions with accounts, including negotiating:

    a.   Wholesale and retail prices for products;

    b.   Service and delivery agreements

    c.   Shelf space to display products

    d.   Product selection

    e.   Promotional pricing for products

    f.   The right to display promotional materials

    g.   Print advertisements in retailers' newspaper ads; and

    h.   Virtually every other term of the arrangement.

40.     Once a customer accepts Flowers' program, the National Accounts Team notifies the local subsidiary of the program's feature, timing, price point, and display, and the subsidiary communicates it to the Distributor.

41.     Neither local subsidiary management nor the Distributors have the authority to change these programs negotiated by the National Accounts Team.

42.     Once a customer accepts Flowers' program, implementing it becomes a mandatory part of Distributors' jobs.

43.     Flowers' also employs a Business Analysis and Insights Team to help create sales presentations to pitch new products to national account retailers.

44.     Flowers handles all marketing efforts for the company, utilizing sophisticated consumer research companies to forecast consumer trends for retailers to make informed decisions on product selection and to support the retailer's brands with advertising and marketing plans and promotions.

45.     Category and brand strategies are set by separate business units organized into a Category and Brand Teams, a Field Marketing Team, and a Product Innovation Team. The business units are responsible for increasing sales of Flowers products, which sales ultimately affect Distributors' livelihoods.

46.     Field Marketing teams monitor Distributors' work inside the stores.

47.     Each Field Marketing team comprises regional managers and field marketers who both direct sales efforts in retail stores serviced by Distributors, and ensure that Distributors carry out marketing programs agreed upon by the National Accounts Team or local sales management.

48.     The Field Marketing team uses mobile software, "GoSpotCheck," to ensure, among other things, that the right products are on store shelves at the right price.

49.     At the local level, Flowers relies on its employee managers to ensure Flowers' products are distributed in accordance with Flowers' national sales strategy.

50.     Like the corporate sales teams, Lepage sales employees are organized in a hierarchy of Regional Vice President of Sales, VP of Region, Market VP, and several Area Sales Directors.

51.     Until January 1, 2018, Lepage also employed a team of Sales Managers; these individuals were promoted to Area Sales Directors or transitioned into Territory Operations Specialists as part of a reorganization.

52.     Distributors interact with their warehouse Sales Managers (now Area Sales Directors) on a daily basis.

53.     To ensure all Area Sales Directors perform consistently, the Vice President of Sales tightly controls each Sales Director through daily and weekly communication.

54.     The Area Sales Directors primary job duties involve supervising Distributors in their day-to-day activities in the following ways:

a.  Being on the dock every morning when Distributors arrive;

b.  Conducting at least 15 "market checks" each week, where the Area Sales Directors go into stores with a checklist to ensure that Distributors have placed products in accordance with the planogram (a diagram showing where each product should go on the shelf), removed stale or out of code product, and are using end caps, promotional displays, and other available shelf space;

c.  Conducting "ride alongs" with Distributors to ensure they are following all of Flowers' requirements;

d.  Visiting "trouble stores;"

e.  Ensuring Distributors make their afternoon callbacks;

f.  Running various reports on stales, days of service, and other metrics;

g.  Verifying Distributors' stale numbers; and

h.  Checking bread orders for routes with high stale numbers.

55.     In addition to ensuring Distributors are properly performing their jobs, all Vice Presidents of Sales (for all Flowers subsidiaries) are required to assign local sales managers sales goals. Those local sales managers build and maintain relationships with store managers, as well as reviewing Distributors' work in those stores and looking for opportunities to make additional sales.

**C.  Defendants Hire and Train Distributors to Make Deliveries and Stock Products**

56.     Distributors serve as the final link in the chain between Flowers, the subsidiaries, and the customers.

57.     The work performed by Plaintiffs simultaneously benefits or benefited Flowers Foods, Inc., Lepage Bakeries, and CK Sales.  Plaintiffs were hired for the purpose of distributing products for Flowers Foods, Inc.

58.     Distributors are hired through a staffing agency using a standardized application, and begin work with Lepage as temporary employees, and are called "Prospective Distributors."

59.     The distribution job performed by Plaintiffs does not require specialized skills or education.

60.     Distributors are not required have owned a business, or have any delivery, sales, or marketing experience. Lepage only requires them to have a (non-commercial) drivers' license and a clear background and drug test.

61.     Distributors hired by Lepage are required to complete a standardized twelve-week training program detailed in the Field Operations Manual, which is focused almost exclusively on Distributors' delivery duties.

62.     Upon successful completion of the training program, Lepage will decide whether a Prospective Distributor becomes a Distributor.

63.     The moment a Prospective Distributors signs a Distributor Agreement, Lepage automatically classifies him as an independent contractor.

64.     The Bakery makes no individual determinations of employment classification for Distributors.

**D. Distributors' Duties are to Deliver and Stock Product.**

65.     On delivery days, which are Monday, Tuesday, Thursday, Friday, and Saturday, Distributors arrive at the warehouse early in the morning to confirm their product orders, make any necessary adjustments, and load their trucks.

66.     Distributors then drive their route to deliver products to customers.

67.     Distributors' investment in equipment to operate their route is relatively low. Distributors use their personal vehicles and a small box truck or trailer to deliver Flowers products to retailers.  Apart from this purchase, there is no other investment necessary because Defendants provide computer equipment, administrative support, warehouse space, advertisements, promotional materials, bakery trays, market advice, strategic development, and virtually every other business necessity.

68.     All of Distributors' routes are wholly within the State of Maine.

69.     Most of Distributors' customers have "Customer Service Requirements," which contain requirements such as days of service, mandatory receiving hours, limits on attire, and other such requirements.

70.     Defendants represent that these requirements come from the customer, but Flowers often has a hand in drafting the requirements or soliciting accounts to provide such requirements to Distributors.

71.     Once at a store, Distributors' duties include:

    a. Placing product on the shelves, usually according to a planogram, which shows exactly where and how many of each product should be placed on the shelf.  Such planograms, as well as shelf space, are agreed to by the National Accounts team and the customer, and cannot be changed by the Distributor;

b.  Rotating product to ensure the oldest product is in the front;

c.  Pulling out-of-code or "stale" product off the shelves according to the "product code," which is ; and

d.  Setting up displays for featured or "promotional" products.  These "promotional planners" are created by the National Accounts Team and the customers, and dictate which products will be on promotion every week.  These planners include the specific product and the price of the product and involve a planogram or stand-alone display.  Distributors are required to adhere to these planners, including ordering sufficient product to fill the shelf or display

72.  Many large accounts require a second visit every day in the afternoon, commonly known as a "recall" to straighten and restock shelves for afternoon business.

73.  Distributors are required to service any new chain or national account that opens in their area or requests service from Flowers/Lepage.

74.  Most accounts are "credit accounts," which remit payment directly to Lepage; Distributors do not collect payment from these accounts.

75.  A few customers are cash accounts, which pay Distributors directly.  Such accounts make up about 4.7% of Lepage's net sales.

76.  At the end of the day, Distributors generally return to the warehouse to "sell back" their out-of-code product to the warehouse thrift store for credit.

77.  A Distributor with consistently high stale returns, may be monitored more closely by management or put on a "stale cap" which limits the amount of product Lepage will purchase back from them.

78.     Distributors also place their orders for product by connecting their handled computer to a warehouse terminal to transmit orders to the bakery.

79.     All Distributors are required to use handheld computers, issued by Flowers, to place orders for products.

80.     Orders must be placed six days in advance.

81.     The handheld gives Distributors "suggested orders" for each account, which they are strongly encouraged to follow.

82.     Lepage may also place orders for Distributors or require Distributors to take featured products.

83.     On non-delivery days, which are Wednesdays and Sundays, each Plaintiff uses his personal small vehicle to perform pull-ups for Defendants, during which Distributors drive to their assigned stores to restock store shelves and pull out-of-code product from the market.

84.     Distributors are paid via weekly "settlement statements" by Lepage, typically through direct deposit to Distributors' bank accounts.

85.     Distributors are essentially paid on commission.  Distributors "purchase" product from Defendants at a percentage discount from the wholesale price.

86.     Depending on the product, Distributors will receive an approximate 3 percent to 23 percent discount or margin on a product, with most products offered at an 18 to 20 percent discount.

87.     These margins are set by Defendants, are non-negotiable, and are the same across regions.

88.     Defendants exert nearly complete control over the prices at which products are sold to customers.

89.     For national accounts, Distributors are forbidden from changing the price of a product.  Distributors sign a "Distributor Checklist" stating that they cannot change the prices for fast food/restaurant business or in national accounts.

90.     Distributors may also receive temporary additional discounts, which are set by Lepage and can be discontinued or reduced by Lepage at will.

91.     Section XII of the Distributor Agreement requires all distributors to remove products past their sell-by date from the retail market.

92.     Products past their sell-by date are known as "Out-of-Code" or "stale" product.

93.     The act of removing the product from retail outlets is colloquially known as "pulling stale."

94.      Distributors are expected pull stale whenever product is out of code.

95.     Products may become out of code on a day that is not a retailer's usual service day; in that case, the Distributor may make a special trip to pull stale. Alternatively, the Distributor may pull the stale product earlier to avoid having to make a special trip.

96.     According to the Distributor Agreement, "Maintaining a fresh market is a fundamental tenet of the baking industry."

97.     Accordingly, "Out of Code Products or Authorized Products left in the market is a material breach of this Agreement."

98.     Defendants regard stale product as a necessary part of operating a direct store delivery program because of the very short time the product stays in a retail outlet.

99.     In recognition of the necessity of stale in the business model, Defendants "repurchase" a certain percentage of each Distributors' stale products

100.    Defendants created a secondary market for product that has been in an outlet for more than a few days but is still salable.

101.    Thrift stores are not the only participants in the secondary market for stale product. Defendants supply stale product to institutions, farmers, and discount retailers such as Big Lots and Dollar Tree.

**E.  Defendants Monitor and Discipline Distributors for Failure of Performance.**

102.    Distributors' relationship with Defendants is governed by the Distributor Agreement, which all Distributors must sign, and which is materially uniform among Distributors.

103.    The Distributor Agreement is entered into by Distributors and Defendant CK Sales, LLC.

104.    The Distributor Agreement requires Distributors to use their "best efforts" in accordance with "good industry practice."

105.    Under obligations of Distributor, the Agreement states:

> Distributor agrees and covenants to use Distributor's commercially reasonable best efforts to develop and maximize the sale of Products to Outlets within the Territory and service the Territory in accordance with Good Industry Practice.

106.    Good Industry Practice is defined as:

> The standards that have developed and are generally accepted and followed in the baking industry, including, but not limited to, maintaining an adequate and fresh supply of Products and Authorized Products in all Outlets requesting service, actively soliciting all Outlets not being serviced, properly rotating all Products and Authorized Products, promptly removing all stale Products and Authorized Products, maintaining proper service and delivery to all Outlets requesting service in accordance with Outlet's requirements.

107.    Defendants thus retain the exclusive right to control the manner and means by which Distributors perform their jobs.

19

108.    The Distributor agreement also lays out discipline and termination procedures.

109.    The Distributor Agreement grants Defendants the right to terminate Distributors on twenty-four hours' notice for a "non-curable breach" or on ten days' notice for an uncured "curable breach."

110.    Flowers defines a non-curable breach to include "any action or inaction on Distributor's part that results in Distributor's inability to service any Chain account." Ex. 11 at § 17.2.

111.    A curable breach is defined to broadly include the "failure of performance by Distributor."

112.    Distributors may be breached for failing to service stores five days per week; having out-of-code products on the shelf; having insufficient quantities of products on the shelf (being out-of-stock); failing to adhere to planograms; or failing to cooperate with the Company on its marketing and sales efforts by, for example, failing to order sufficient product to fill a special display.

113.    Plaintiffs were required to accept Defendants' conditions of employment or face termination.

**F.  Distributors are Not Engaged in Sales.**

114.    Defendants represented to Plaintiffs that they would run their businesses independently, have the discretion to use their business judgment, and have the ability to manage their businesses to increase profitability

115.    Contrary to its representations, as outlined above Distributors responsibilities are limited to delivering and stocking Flowers' products for Flowers' customers.

116.    The Distributor Agreement does not require Distributors to grow, increase, or make "sales."

117.    Distributors do not have sales goals or targets set by Defendants.

118.    Defendants do nothing to ensure Distributors are regularly engaged in sales-related activities.

119.    Defendants do not track the amount of time Distributors spend trying to increase or make sales.

120.    Defendants do not keep records of when Distributors obtain new business.

121.    Defendants do not keep records of the growth rate of Distributors' territories.

122.    Defendants do not keep records of sales directly attributable to the efforts of Distributors.

123.    Defendants have no way of knowing whether a Distributor is working to promote new products.

124.    Distributors are not disciplined for failing to engage in sales-related activity.

125.    Defendant's strategy to grow sales is not dependent upon the sales efforts of Distributors.  Rather, as described in Section B, *supra*, Defendants employ a vast marketing and sales team to manage relationships with customers, develop and promote new products, and negotiate pricing, shelf space, and promotions.

**G. Distributors Do Not Operate in Interstate Commerce.**

126.    The Distributor Agreement signed by all Distributors is a contract with CK Sales, LLC.

127.    CK Sales, LLC is not a motor carrier within the meaning of the FLSA.

128.    In recent filings, Flowers Foods argued to the Eleventh Circuit Court of Appeals that Flowers and its subsidiaries are "not part of the transportation industry" because Flowers is a "baking company, not a shipping or logistics company."  *See Martins v. Flowers Foods, Inc. et al.*, No. 20-11378, Reply Brief for Defendants-Appellants, at 3-4 (11th Cir. Aug. 24, 2020).

129.    Flowers further argued that Distributors "are not actually engaged in the transportation of goods in interstate commerce …" and that "Plaintiffs are, first and foremost, independent business owners, not truck drivers.  And any transportation Plaintiffs do undertake is exclusively local, not interstate."  *Id.* at 7.

130.    Flowers bases this argument on the fact that Plaintiffs do not transport good across state lines – rather, they own "geographically bounded businesses that operate exclusively within a single state."  Moreover, in response to the argument that the "interstate" requirement is satisfied by the fact that Plaintiffs transport goods that may, at some point in their history, have crossed state lines, Flowers argues "that argument has no basis in statutory text, legislative purpose, or historical context."  *Id.* at 9.

131.    Likewise, here, Plaintiffs' routes are limited to the State of Maine.

132.    Although some of the products Plaintiffs deliver come from out-of-state bakeries, this is not sufficient to demonstrate that Plaintiffs operate in interstate commerce.

133.    Plaintiffs place orders through their handheld computers.  These orders go directly to Lepage.

134.    The handheld interfaces with a centralized system called SAP, which captures the orders from each Distributor, consolidates them, and sends them to the bakery for production.

135.    Orders are thus aggregated from distributors from different warehouses and even different subsidiaries.

136.    Once produced, the various bakeries, both in-state and out-of-state, ship their products using a third-party shipper to Lepage Bakeries.

137.    Once the products arrive at Lepage Bakeries, employees sort it by warehouse and ship it out.  The product may be stored for up to two days before being shipped out.

138.    At the warehouse, Lepage employees break down the product loads by Distributors.

139.    Thus, bakeries do not know to whom its products will ultimately be shipped, and Distributors do not know from which bakery its products arrived.

140.    Plaintiffs therefore do not operate in interstate commerce within the meaning of the Motor Carrier Act.

141.    Even if Plaintiffs are considered to operate in interstate commerce, each Plaintiff uses his personal vehicle, weighing less than 10,000 pounds to perform at least "some meaningful work" for Defendants.

142.    Specifically, each Plaintiff drives his small personal vehicle at least twice a week on Wednesdays and Sundays to perform pull-ups, during which restock store shelves and pull out-of-code product from the market.

143.    Pull-ups are required by Defendants and Defendants can discipline Distributors for failing to perform pull-ups.

144.    Therefore, even if Plaintiffs operate in interstate commerce, they are still entitled to overtime under the Technical Corrections Act.

**H.  Defendants' Violations of the FLSA were Willful and Defendants Lacked Good Faith and a Reasonable Basis to Classify Plaintiffs as Independent Contractors.**

145.    Defendants uniformly label Distributors as independent contractors.

146.    Defendants do not consider any individual Distributors' circumstances in determining whether the individual is an employee or independent contractor under the FLSA.

147.     Defendants do not receive a legal determination as to the classification of any particular Distributor.

148.     At the time Defendants classified their Maine Distributors as independent contractors, it was involved in litigation challenging the classification of Distributors in the state of North Carolina.  *See Rehberg v. Flowers Foods*, No. 3:12-cv-00596 (W.D.N.C.).

149.     Upon information and belief, Defendants did not receive a legal opinion or advice as to the propriety of re-classifying its Route Sales Associates as independent contractors.

150.     Upon information and belief, Flowers Foods has been on notice since at least 1985 or 1986 that its classification of Distributors as independent contractors is legally suspect.

151.     Flowers Foods has been sued for FLSA violations at least 17 times since 2012.

152.     Upon information and belief, Defendants knew that Plaintiffs performed work that required overtime pay and knowingly and willfully failed to pay Plaintiffs their overtime wages due and owning.

153.     Defendants have operated under a scheme to deprive Plaintiffs of overtime compensation by failing to properly compensate them for all time worked.

154.     Defendants' conduct, as set forth in this Complaint, was willful and lacked good faith, and has caused significant damages to Plaintiffs.

155.     Defendants are liable under the FLSA for failing to properly compensate Plaintiffs for their overtime work.

## **JOINDER IS PROPER UNDER RULE 20**

156.     Under Federal Rule of Civil Procedure 20(a)(1), Plaintiffs may join in one action if: (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising

out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action.

157.     Here, as detailed above, all Plaintiffs operated as Distributors for Defendants in Maine pursuant to a Distributor Agreement which was substantially similar between Plaintiffs, all Plaintiffs performed essentially the same duties as Distributors, and all Plaintiffs worked in excess of 40 hours per week without overtime compensation.  Thus, Plaintiffs' request for compensation for overtime arises out of the same series of transactions or occurrences.

158.     In addition, the following questions of fact and law are common to all Plaintiffs:

a.  Whether Plaintiffs have been misclassified as independent contractors;

b.  Whether Plaintiffs were denied overtime under the FLSA;

c.  Whether Plaintiffs are entitled to declaratory relief declaring they are employees of Defendants;

d.  Whether Plaintiffs are entitled to injunctive relief requiring Defendants to convey to Plaintiffs the rights, privileges, and benefits of employees.

<u>**COUNT I**</u>
**VIOLATION OF THE FAIR LABOR STANDARDS ACTS OF 1938**
**29 U.S.C. §§ 201 ET SEQ.**
**Overtime Violations**

159.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding Paragraphs.

160.     Section 207(a)(1) of the FLSA provides in pertinent part:

Except as otherwise provided in this section, no employer shall employee any of his employees who in any work week is engaged in commerce or in the production of goods for commerce, for a work week longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

25

161.    Plaintiffs do not operate in interstate commerce, and therefore the Motor Carrier Act exemption does not apply to Plaintiffs.

162.    Even if Plaintiffs are found to operate in interstate commerce, Plaintiffs routinely drive or drove their personal vehicles for work, and therefore the Motor Carrier Act exemption does not apply.

163.    Plaintiffs are not regularly engaged in sales, and therefore the Outside Sales Exemption does not apply.

164.    Each Plaintiff regularly worked more than 40 hours per week, but did not receive overtime pay.

165.    At all relevant times, Defendants have had gross operating revenues in excess of $500,000.

166.    In committing the wrongful acts alleged to be in violation of the FLSA, Defendants acted willfully in that they knowingly, deliberately, and intentionally failed to pay overtime premium wages to Plaintiffs.

167.    As a result of Defendants' failure to pay overtime premium wages, Plaintiffs were damaged in an amount to be proved at trial.

168.    Therefore, Plaintiffs each demand that he be paid overtime compensation as required by the FLSA for every hour of overtime worked in any work week for which they were not compensated, plus interest, damages, penalties, and attorneys' fees as provided by law.

## COUNT II
## DECLARATORY JUDGMENT

169.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding Paragraphs.

170.    Under the relevant laws of the United States, Defendants have misclassified Plaintiffs as independent contractors rather than employees; therefore, pursuant to 28 U.S.C. § 2201, this court should issue a declaratory judgment establishing that Plaintiffs are or were employees of Defendants and that Plaintiffs are or were therefore entitled to all of the rights and benefits of employment pursuant to the laws of the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request of this Court the following relief:

a.      Judgment that Plaintiffs are non-exempt employees entitled to protection under the FLSA;

b.      Judgment against Defendants for violation of the overtime provisions of the FLSA;

c.      Judgment that Defendants' violations of the FLSA were willful;

d.      Judgment that Defendants lacked a good faith or reasonable basis for classifying Plaintiffs as independent contractors;

e.      An Order for declaratory and injunctive relief designating the Plaintiffs as employees and enjoining Defendants from pursuing the illegal policies, acts, and practices described in this Complaint;

f.      An Order declaring the Defendants' conduct as willful, not in good faith and not based on reasonable grounds;

g.      An Order requiring Defendants to compensate Plaintiffs for the reasonable value of the benefits Plaintiffs provided to Defendants;

h.      Reimbursement of unpaid wages at overtime rates for all overtime work as described in this Complaint;

i.      Payment of any penalties or other amounts under any applicable laws, statutes, or regulations, including but not limited to liquidated damages;

j.      Judgment in favor of each Plaintiff for damages suffered as a result of the conduct alleged herein, to include pre-judgment interest;

k.      Award Plaintiffs reasonable attorneys' fees and costs;

l.      Award Plaintiffs punitive damages in an amount to be determined at trial; and

m.      Grant such other and further legal and equitable relief as this Court deems just and necessary.

Respectfully submitted,

Dated: October 29, 2020

s/Amy P. Dieterich
Amy. P. Dieterich (#5413)
SKELTON, TAINTOR & ABBOTT
95 Main Street
Auburn, Maine 04210
Telephone: (207) 784-3200
Fax: (207) 784-3345
adieterich@sta-law.com

Shawn J. Wanta, *pro hac vice pending*
Christopher D. Jozwiak, *pro hac vice pending*
Scott A. Moriarity, *pro hac vice pending*
BAILLON THOME JOZWIAK & WANTA LLP
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Fax: (612) 252-3571
samoriarity@baillonthome.com
sjwanta@baillonthome.com
cdjozwiak@baillonthome.com

Susan E. Ellingstad, *pro hac vice pending*
Rachel A. Kitze Collins, *pro hac vice pending*
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Fax: (612) 339-0981
seellingstad@locklaw.com
rakitzecollins@locklaw.com

J. Gordon Rudd, Jr., *pro hac vice pending*
David M. Cialkowski, *pro hac vice pending*
ZIMMERMAN REED PLLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Fax: (612) 341-0844
Gordon.Rudd@zimmreed.com
David.Cialkowski@zimmreed.com

*Attorneys for Plaintiff*